UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| BRUCE D. JOHNSON, | ) | |
|---|---|---|
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | No. 12 C 10266 |
| JOHNSON & JOHNSON, d/b/a/ JANSSEN BIOTECH, INC. | ) ) ) ) | Judge Rebecca R. Pallmeyer |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Bruce Johnson, an African-American man, worked for Johnson & Johnson d/b/a/ Janssen Biotech, Inc. ("JBI") for several years as a field sales representative. In this action, Johnson claims that JBI discriminated against him on the basis of his race in denying him tuition reimbursement. He contends, as well, that JBI discriminated on the basis of his race and retaliated against him by given him a poor performance evaluation, a limited bonus, and "below-standards field coaching reports" and by placing him on a performance improvement plan. Finally, Mr. Johnson contends JBI violated the Americans with Disabilities Act by requiring him to take disability leave rather than receiving workers' compensation, which resulted in use of his vacation time and reduced income. JBI seeks summary judgment on all of these claims and, as explained here, the motion is granted.

## FACTS

Defendant JBI filed a statement of undisputed material facts, supported by record materials, as called for by our court's Local Rule 56.1. Because Mr. Johnson's attorney ceased representing him after the initial status conference, JBI served Plaintiff with the Local Rule 56.2 notice required when summary judgment is sought against an unrepresented party. Mr. Johnson did not comply with the requirements of Rule 56.1, offering instead only an e-mail message setting forth his own version of events. In light of Mr. Johnson's unrepresented status,

the court has reviewed his submission generously. The court has also reviewed all of the materials that appear in the record, including all available pages of Plaintiff's deposition, whether or not cited by Defendant. Where Defendant's statement of facts is properly supported and otherwise unrebutted, the court adopts it.

Plaintiff, an African American man, began working for JBI (then known as Centocor, Inc.) in November 2006. (Def.'s 56.1 Statement [23] ¶¶ 3, 7.) Initially, Plaintiff reported to Shirley Walker, an African-American woman who held the title of Senior District Manager for what Defendant refers to as the "Dermatology franchise in the Central Region." (*Id.* ¶ 8.) After Ms. Walker left JBI in September 2010, Plaintiff reported to interim managers and then, beginning in June 2011, to Chad Lueck. (*Id.* ¶¶ 9, 10, 40.) Beginning in April 2008, David Gelfuso was Regional Business Director for the Central Region—a position that, the court infers, made Gelfuso a supervisor of Plaintiff's managers. (*Id.* ¶ 11.)

**Tuition Reimbursement**

At the time Plaintiff was hired in 2006, he recalls, Shirley Walker told him that JBI would reimburse him for his tuition for an Executive MBA program at Notre Dame. (*Id.* at ¶ 12.) Plaintiff's offer letter made no mention of tuition reimbursement, however; instead, it included language advising Plaintiff that the letter constituted a "complete offer package," and that any written or oral promises "not contained in this letter are . . . not binding" on JBI. (*Id.* ¶ 13, citing Oct. 26, 2006 letter, Exhibit C to Def.'s 56.1 Stmt.; Johnson Deposition, Exhibit A to Def.'s 56.1 Stmt., at 142.) Though she had assured Plaintiff that JBI would pay his tuition, Plaintiff testified that just months after he enrolled in the program in January 2008, Ms. Walker told him he would have to quit school if he wanted to keep his job. (Def.'s 56.1 Stmt ¶ 14; Johnson Dep. at 134.) Plaintiff did drop out of the program. (*Id.*) JBI's tuition reimbursement policy has been limited, since 2009, to managers or directors, and Plaintiff admits that he did not have that status. (*Id.* ¶ 16; Johnson Dep. at 143.) Plaintiff claims that some time in 2009 or 2010, Mr. Gelfuso nevertheless promised that if Plaintiff were to re-enroll in the program, Gelfuso would "take care

2

of" Plaintiff's tuition. (*Id.* ¶¶ 16, 17; Johnson Dep. at 146, 149-50.) Plaintiff did not in fact re-enroll in the program and never submitted a request for tuition reimbursement. (Johnson Dep. at 150-51.) Three years after dropping out, in August 2011, he filed an EEOC charge in which he alleged that he had been denied tuition reimbursement on the basis of his race. (Def.'s 56.1 Stmt. ¶ 15.)

**LaGrange Account**

Early in 2010, Dermatology Associates of LaGrange was within the sales territory assigned to Plaintiff. (*Id.* ¶ 19.) After the departure of another sales representative reporting to Ms. Walker, however, accounts were re-assigned, and the LaGrange account was assigned to another sales team member, Sheree Ramsey, also African American. (*Id.* ¶¶ 20, 21.) Plaintiff believes that Mr. Gelfuso approved the decision, so he asked Gelfuso about it in a November 9, 2010 e-mail. (*Id.* ¶¶ 22, 23; Nov. 9, 2010 e-mail exchange, Exhibit F to Def.'s 56.1 Stmt.) Mr. Gelfuso responded that the change was part of an effort to "balance the workloads," but that he would consider whether "it makes sense to move LaGrange back into [Plaintiff's] territory, . . . ." (Nov. 9, 2010 e-mail exchange; Johnson Dep. at 301.) Effective on January 1, 2011, the LaGrange account was returned to Plaintiff. (Def.'s 56.1 Stmt. ¶ 25.) As a result of the brief transfer of the LaGrange account, Plaintiff suffered what he referred to as a "low bonus payout" and loss of "compensation for his accounts in his territories," but he acknowledged the effect of the LaGrange account transfer on his 2010 bonus was "nominal." (*Id.* ¶ 26, citing First Amended Complaint ¶¶ 7(b), (c); Johnson Dep. at 169.)

**Low Performance Evaluation**

For the year 2010, Plaintiff received a performance rating of "5" on JBI's 1-9 scale, a rating that signifies the employee "meets and sometimes exceeds expectations." (Def.'s 56.1 Stmt. ¶¶ 27, 20.) Pursuant to JBI policy, that rating was based 60% on Plaintiff's sales performance and 40% on leadership, but Plaintiff believed a complaint he had made against Ms. Walker in 2010 had a negative effect on his rating. (*Id.* ¶¶ 29, 30, 34.) Specifically, Plaintiff told

3

Ms. Walker in June 2010 that he was unwilling to continue assisting her in some of her duties as Senior District Manager because they were outside the scope of his job. (*Id.* ¶ 31.) In fact, however, a leadership score that Ms. Walker had given Plaintiff boosted his rating; based on sales results alone, Plaintiff earned only a "4" rating. (*Id.* ¶¶ 33, 34.) Beginning in late September 2010, Ms. Walker took a leave of absence from JBI and never returned to work. (*Id.* ¶ 32.) Mr. Gelfuso assumed responsibility for completing 2010 performance reviews for the sales representatives who had reported to Ms. Walker, including Plaintiff. (*Id.*) Plaintiff received a salary increase as a result of his 2010 rating. (*Id.* ¶ 35.) Of the seven other members of the sales team, an African American received the highest rating (a 9), and one of two Caucasian members of the team received a rating of 4. (*Id.* ¶ 36.)

**June 7, 2011 Memorandum**

On June 7, 2011, Plaintiff's new manager, Chad Lueck, sent Plaintiff a memorandum documenting a meeting with Plaintiff and an interim manager, in which Lueck discussed Plaintiff's absences from work during May 2011 and warned Plaintiff about the need to properly document his absences. (*Id.* ¶¶ 39, 41, 42.) Plaintiff objected to that warning, asserting that he had telephone records that would confirm he had in fact properly reported his absences. (*Id.* ¶¶ 43, 44.) A Human Resources representative, Carrie Palmer, investigated the matter. (*Id.* ¶ 43; Johnson Dep. at 331.) Plaintiff testified that he was suspicious of her efforts because he had become "a conspiracy theorist" and therefore "doubted the sincerity of everyone's efforts at the time," a doubt he attributes to "gut feeling." (Johnson Dep. at 345.) Plaintiff was given the opportunity to furnish the telephone records and to provide documentation concerning a family member's illness, so that his May 2011 absences could be converted to Family and Medical Leave. (Def.'s 56.1 Stmt. (¶ 45.) He never provided the phone records or documentation, however, and he acknowledged that he had no facts to support his suspicion that Mr. Lueck issued the June 7, 2011 memorandum because of Plaintiff's race. (*Id.* ¶¶ 44, 45, 46; Johnson

4

Dep. at 332-33.) The June 7, 2011 memorandum did not affect Plaintiff's salary or benefits. (Def.'s 56.1 Stmt. ¶ 47.)

**"Below Standards" Field Coaching Reports**

Mr. Lueck accompanied Plaintiff on visits to customers and prepared Field Coaching Reports to document Plaintiff's performance. (*Id.* ¶ 48.) Although the FCRs that Mr. Lueck prepared in September 2011, October 2011, and March 2012 include substantial praise as well as criticism, Plaintiff believes they were inaccurate. (*Id.* ¶ 49, citing FCRs, Exhibit K to Def.'s 56.1 Stmt.) Plaintiff suspected the sales numbers on the FCRs were "manipulated," but has no facts to support this suspicion. (*Id.* ¶ 51.) In any event, the FCRs had no effect on Plaintiff's salary or benefits. (*Id.* ¶ 52.)

**February 10, 2012 Performance Memorandum**

Chad Lueck issued a Below Standards Performance Memorandum ("BSPM") on February 10, 2012. (*Id.* ¶ 54.) Mr. Lueck's February 10, 2012 Memorandum presents specific identifiable concerns: declining sales performance and poor selling skills. (Feb. 10, 2012 Memorandum, Exhibit L to Def.'s 56.1 Stmt.) ("You ask very few questions to better understand your customer's needs and you are rarely moving your customer to action by asking them for their business.") Lueck noted that Plaintiff had not learned to use his iPad effectively and was unable to answer a customer's question about a product. (*Id.*) Though Plaintiff contests Lueck's assessment of his performance in general terms, he offers no factual rebuttal of the objective findings Lueck presented. (Johnson Dep. at 364 ("Q. [Your disagreement has] "[n]o factual basis, but only your suspicion? A. Exactly.") He offers only his "gut feeling" that the sales numbers Lueck presented were "manipulated." By his own admission, Plaintiff became a "conspiracy theorist" and came to believe almost every decision JBI made about him was a product of race discrimination or retaliation. (Id. ¶ 59, citing Johnson Dep., Exhibit A to Def.'s 56.1 Statement, at 262-63, 345.)

Plaintiff believes Mr. Lueck "dislike[d]" him and retaliated against him because Plaintiff did not participate in the telephone call in which Mr. Lueck had been introduced as manager. (*Id.* ¶ 50; Johnson Dep. at 348 ("The retaliation was because of the conference call that I missed . . . when he was introduced as the new district manager."); Johnson Dep. at 352 (acknowledging that an August 2011 complaint regarding retaliation was a reference to the fact that Lueck was angry or displeased because Plaintiff was not on the call).) The BSPM did not affect Plaintiff's salary or benefits. (*Id.* ¶ 55.)

**Performance Improvement Plan**

When things had not turned around by June 2012, Lueck placed Plaintiff on a Performance Improvement Plan ("PIP") that set forth a number of specific concerns and goals for improvement. (*Id.* ¶ 56; Performance Improvement Plan, Exhibit M to Def.'s 56.1 Stmt.) Plaintiff contests "everything" about the PIP. (Johnson Dep. at 379.) He filed a charge of discrimination concerning the PIP on August 2, 2012, and took a leave of absence beginning that same day, never completing the leave of absence. (*Id.* at 381; Def.'s 56.1 Stmt. ¶ 57.)

**Disability Discrimination Claim**

On August 2, 2012, Plaintiff took a leave of absence, providing a medical notice that he suffered from "severe pain, muscle tension + stiffness" and could not return to work until August 20, 2012. (*Id.* ¶ 60, 62.) Though the notice did not characterize Plaintiff's condition as work-related, Plaintiff contends that JBI discriminated against him because of his disability by placing him on short term disability rather than workers' compensation. (*Id.* ¶ 63, citing First Amended Complaint at ¶ 7(d).) He acknowledges that no one at JBI told him he could not apply for workers' compensation; that the short term disability payments he received exceeded the workers' compensation benefit for which he was eligible; and that he is now in fact receiving the maximum temporary total disability benefits available under Illinois law. (*Id.* ¶¶ 64, 65, 66, citing Johnson Dep. at 254-55, 272, 273-74, 304.)

**Plaintiff's Factual Submission**

As noted, though he did not submit a paragraph-by-paragraph response to Defendant's Rule 56.1 Statement, Plaintiff did offer a factual statement in an e-mail submission to Defendant, which Defendant has filed. Plaintiff contends, in that submission, that his performance "improved consistently" and that Mr. Gelfuso promoted him twice in a single year, until a breakfast meeting at which Plaintiff disclosed to Mr. Gelfuso that he was "the ghost writer for African-American Managers" concerning Gelfuso's "racist discriminatory ways." (Plaintiff's e-mail submission [28] ¶¶ 1, 2; *see also* Johnson Dep. at 224 ("I received two raises within 18 months, or two promotions . . . [b]ased on decisions . . .[that] Dave Gelfuso approved.") Plaintiff does not say when or where this breakfast meeting took place, nor does he identify any document[s] for which he was the "ghost writer."[1] Nor does he otherwise describe the "racist discriminatory ways" in which Mr. Gelfuso, who promoted Plaintiff twice, had engaged.

Instead, Plaintiff notes his excellent work performance: In 2008, he was the only sales representative in his region to be selected to attend a seminar in New Jersey. (*Id.* ¶ 3; Johnson Dep. at 230 ("I was also chosen out of like two reps in the nation to go to the Steven Covey presentation over in New Jersey . . . .") He "[f]inished #22 [he does not say out of how many] for the year" and was in the "[t]op 1/3 in the country." (Id.) He was chosen to "run and control a VA Account" of significant magnitude, an assignment "three levels above [his] pay grade." (*Id.*) In 2009, Plaintiff was ranked highly on "Q1, Q2, and Q3" [he does not explain what these are], and finished "in the Top 1/3 of country again." (*Id.* ¶ 4.) He "was one of the Top 12 representatives" and he served as acting District Manager when his manager, Shirley Walker, was absent. (*Id.*) On an unidentified date, he was chosen as "lead representative" for JBI at the American Medical Association. (*Id.* ¶ 5.) Dave Gelfuso selected him to serve on advisory boards at national conventions in "three consecutive years before discriminatory actions from Dave Gelfuso and

---

[1] The only written complaint in the record, described below, bears Plaintiff's name as its author and shows that Gelfuso was provided with a copy of it.

7

Chad Lueck." (*Id.*) (Again, Plaintiff does not explain the apparent contradiction between his assertions that Gelfuso was guilty of "racist discriminatory ways" and Gelfuso's selecting Plaintiff for these important assignments.)

In June 2011, Plaintiff asserted, he received a verbal warning (presumably a reference to the attendance reporting matter), though earlier that year he had "ranked in the Top 5% of the Country; finishing in 4th place Nationwide with awards sent from . . . [the] National Sales Director of Immunology." (*Id.* ¶ 6.) Plaintiff was "ranked 65 of 119," but received a Performance Improvement Plan six months later. (*Id.*) Plaintiff believes he was placed on "verbal and written plans" after he filed "an internal and external complaint" of race discrimination, though, he asserts without any other support, his performance was better than that of representatives who had not complained. (*Id.* ¶ 7.) He notes that Dawn Bodzick, a white female, "was ranked lower than me and not placed on any PIP . . . ." (*Id.* ¶ 9.) After Chad Lueck placed him on a PIP, Plaintiff asserts, he was "subjected to field coaching rides that were negatively subjective, demeaning and harassing," in contrast to the (unidentified) positive Field Coaching Reports he had received before filing his "internal/external complaints of discrimination." (*Id.* ¶ 10.)

**Plaintiff's Complaints of Discrimination**

In addition to his claims of race discrimination, Plaintiff contends that his managers retaliated against him for his complaints of race discrimination. The record contains three written complaints: On December 3, 2010, Plaintiff wrote an e-mail message to his managers, with a copy to Dave Gelfuso, in which he complained that his "dreams [had] come to a halt or continually deferred" during his employment with Defendant. (Dec. 3, 2010 E-mail exchange, Exhibit D to Def.'s 56.1 Stmt.) He presented a time line that referred, among other things, to the La Grange reassignment; Plaintiff's request for a conference call to discuss accounts; abusive language at a meeting; a broken promise that he would receive a "special assignment"; and his own strong sales performance. (*Id.*) The only references to race discrimination in this e-mail were a statement that Dave Gelfuso had admitted that two employees "shared with their

8

Supervisor that Dave Gelfuso is thought to be a racist" and the allegation that Plaintiff's educational program was denied because, according to Shirley Walker, "Dave Gelfuso would not approve it for Blacks!" (*Id.*) JBI's president, Robert Bazemore, responded to Plaintiff's concerns, stating that he was "very sorry" to hear of Plaintiff's difficulties and that he had asked the Director of Human Resources to conduct an investigation. (*Id.*) Bazemore assured Plaintiff, "You have my commitment that I will monitor the situation' and that "we will make every effort to appropriately handle" it. (*Id.*)

On August 11, 2011, Plaintiff filed a charge of discrimination with the EEOC, complaining that he had "made a complaint of race discrimination" concerning the denial of tuition reimbursement, the "low performance evaluation rating, low bonus payout, verbal warning, and a written warning." (Aug. 11, 2011 Charge, Exhibit D to Def.'s 56.1 Stmt.) On April 4, 2012, Plaintiff filed another charge, again complaining about the same incidents he mentioned in the August 2011 charge, and adding that "Since filing my charge of discrimination, I have received a below standards performance, low salary increase, harassed, and denied compensation for accounts in my territories." (April 4, 2012 charge, Exhibit N to Def.'s 56.1 Stmt.) Plaintiff's third charge, filed on August 2, 2012, repeats the complaints he made earlier, and adds the language that "In or around June 15, 2012, I was placed on a performance improvement plan and threatened with discharge." (Aug. 2, 2012 charge, Exhibit N to Def.'s 56.1 Stmt.)

## **DISCUSSION**

Defendant JBI seeks summary judgment on all of Plaintiff's claims. The court will grant such a motion when "there is no genuine dispute as to any material fact" such that "the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In examining the record, the court "construe [s] all facts and draw[s] reasonable inferences in the light most favorable to the nonmoving party." *Righi v. SMC Corp.*, 632 F.3d 404, 408 (7th Cir. 2011). When the moving party presents undisputed evidence in its favor, summary judgment "is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of

9

fact to accept its version of the events*." Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (internal quotation marks and citation omitted). Defendant JBI contends that Plaintiff's tuition reimbursement claim is time-barred; that the other incidents Plaintiff complains of are not "materially adverse" employment actions for purposes of his race discrimination claims or are not supported by evidence of "protected activity" for purposes of his retaliation claim; and that Plaintiff's receipt of short term disability payments rather than workers' compensation does not implicate the ADA.

I. **Tuition Reimbursement Claim is Untimely**

To bring a Title VII claim, a plaintiff must file an EEOC charge within 300 days after the unlawful practice occurred. 42 U.S.C. § 2000e–5(e)(1); *Groesch v. City of Springfield*, 635 F.3d 1020, 1024 n.2 (7th Cir. 2011). Plaintiff Johnson contends that Shirley Walker, his manager, assured him during his job interview that he was entitled to tuition reimbursement. Plaintiff's offer letter makes no mention of such a benefit and contains language specifically warning that any promises not mentioned in the letter were not enforceable. Plaintiff nevertheless claims he expected his tuition would be paid by JBI, and enrolled in classes until Ms. Walker required him to drop out early in 2008. Plaintiff never submitted a claim for tuition reimbursement and did not file his charge of discrimination challenging the denial of the money until August 11, 2011, well after 300 days had passed since the alleged wrong.

A race discrimination claim may also proceed under 42 U.S.C. § 1981. Section 1981 claims are governed by a four-year statute of limitations, running from the date of the alleged unlawful activity to the date of filing of the lawsuit. *See Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382, 124 S. Ct. 1836, 158 L.Ed.2d 645 (2004); *Smith v. Bray*, 681 F.3d 888, 896 n.2 (7th Cir. 2012). Plaintiff's lawsuit, which was not filed until December 24, 2012, is untimely even under this more generous standard. Plaintiff's response makes no mention of the tuition reimbursement claim at all. That claim is dismissed as untimely. The court notes, in any event, that apart from a statement he claims was made by Ms. Walker, Plaintiff has offered no basis for

the conclusion that denying him this benefit was motivated in any fashion by his race, and the evidence reflects a non-discriminatory reason for the decision: that Plaintiff's position at JBI did not qualify him for the benefit.

## II.     Race Discrimination Claim:  No Adverse Employment Action

By Plaintiff's own account, Dave Gelfuso recognized his superior performance, promoted him twice, and selected him three straight years for service on prestigious advisory boards at national meetings.  Plaintiff nevertheless identifies incidents of what he believes was adverse treatment and attributes them to race discrimination.  Not everything that makes an employee unhappy qualifies as adverse action, for purposes of a race discrimination claim, however. *Traylor v. Brown*, 295 F.3d 783, 788 (7th Cir. 2002).  Instead, as the Supreme Court has recognized, an adverse employment action is a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities or a decision causing a significant change in benefits*."  Burlington Indus., Inc. v. Ellerth*, 524 U.S. 761 (1998) (adopting this standard, well recognized in race discrimination claims in the lower courts, for purposes of a sexual harassment claim).

None of the incidents of which Plaintiff complains qualifies as such a "significant change."  First, the 2010 performance rating:  Plaintiff himself was "really not sure" that the 2010 performance rating was a product of race discrimination (Johnson Dep. at 236), and the evidence shows that an African American member of his team received the highest rating, and that Caucasian team members were ranked lower.  A performance rating of 5 reflected his manager's assessment that he was meeting expectations, and resulted in a pay raise.  Plaintiff was unhappy with that rating, but a performance evaluation that suggests there is room improvement is not by itself a materially adverse action.  *See Davis v. Time Warner Cable of Se. Wis., L.P.*, 651 F.3d 664, 677 (7th Cir. 2011*); Volovsek v. Wis. Dep't of Agric., Trade & Consumer Prot.*, 344 F.3d 680, 688 (7th Cir. 2003); *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996).

Brief reassignment of the LaGrange account affected Plaintiff's bonus, but the effect was, in Plaintiff's own estimation, "nominal." A nominal one-time change in compensation cannot qualify as adverse employment action. The court notes, in any event, that the sales representative to whom the LaGrange account was briefly reassigned is herself African-American. And after Plaintiff voiced concern about the reassignment, it was swiftly reversed.

Plaintiff received a verbal and written warning regarding attendance reporting in June 2011; received a Below Standards Performance Memorandum on February 10, 2012, and was placed on a Performance Improvement Plan in June 2012. He was given the opportunity to present records that would rebut the attendance reporting claim, but declined to do so. Nothing beyond Plaintiff's "gut feeling" calls any of Lueck's assessments of his performance into question. More importantly, there is no evidence that the warnings or Memorandum had any tangible consequences. He did not lose pay any pay, and was not suspended, demoted, or discharged. Plaintiff acknowledged that his base salary rose every year. (Johnson Dep. at 167.) Neither the attendance warning, Lueck's unfavorable performance evaluation, the BSPM, nor the PIP constitutes an adverse employment action. *Oest v. Illinois Department of Corrections*, 240 F.3d 605, 613 (2001).

### III. No Evidence of Retaliation for Protected Activity

The account reassignment, poor performance evaluation, and other write-ups are not actionable as race discrimination, but courts have been more willing to consider such incidents as relevant to a claim of retaliation. In brief, an action that would tend to discourage a reasonable employee from engaging in protected activity can constitute retaliation. *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 126 S.Ct. 2405, 2415 (2006) *citing Washington v. Illinois Dept. of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005). The court will assume the actions of which Plaintiff Johnson complains meet that test. His retaliation claim nevertheless fails because there is no basis for a finding of any causal link between his complaints of discrimination and these incidents, as required for a claim of retaliation. *See*

*Stutler v. Illinios Dept. of Corrections*, 263 F.3d 698, 702 (7th Cir. 2001) (failure to make a showing of adverse employment action or a causal link is a "fatal blow" to plaintiff's case).

First, there is no evidence that it was Mr. Gelfuso who transferred the LaGrange account briefly in 2010. Plaintiff admits he was advised that "sales operations" made the decision. (Johnson Dep. at 580.) More importantly, when Plaintiff inquired about the wisdom of the reassignment on November 9, 2010, Gelfuso responded immediately and assured Plaintiff the decision would be reversed. That decision pre-dated Plaintiff's internal complaint of discrimination and could not have been caused by it. Gelfuso asserts that he offered no subjective input to Plaintiff's 2010 performance rating (Gelfuso Declaration, Exhibit B to Def.'s 56.1 Stmt., ¶ 11), and Plaintiff has offered no rebuttal to that statement. As the courts have recognized, "timing alone is insufficient to establish a genuine issue of material fact to support a retaliation claim." *Brown v. Ill. Dep't of Natural Res.*, 499 F.3d 675, 685 (7th Cir. 2007) (quotation marks omitted); see *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 939–40 (7th Cir. 2007).

Nor is there any basis for a conclusion that Chad Lueck was retaliating against Plaintiff for protected activity. Lueck asserts he was unaware that Plaintiff had filed any charge until Plaintiff told him this in March 2012. (Lueck Declaration, Exhibit J to Def.'s 56.1 Stmt., ¶ 8.) Significantly, Plaintiff himself does not appear to believe that his protected activity was the reason for what he deems adverse action. By his account, Lueck disliked him not because of any complaints he had made, but because Plaintiff did not participate in a telephone call during which Lueck had been introduced as a new manager. As described above, Lueck's criticisms of Plaintiff's performance were detailed and specific, and Plaintiff presents nothing to rebut them. If Lueck was in fact angry about Plaintiff's failure to participate in a phone call, his acting on that feeling may have been petty and unwise, but it is not retaliation for protected activity.

JBI is entitled to summary judgment on Plaintiff's retaliation claim, as well.

### IV. No Violation of ADA

Plaintiff's final claim bears only brief discussion. Due to an apparent misunderstanding, Plaintiff's request for leave was initially classified as short-term disability. Plaintiff felt this decision was improper (Johnson Dep. at 273-74), but he acknowledges that it did not result in any financial loss; to the contrary, the short-term disability benefits he recovered are more generous than workers' compensation benefits. He is now receiving those benefits. Plaintiff has not identified anyone who is responsible for the alleged misclassification. More importantly, the Americans with Disabilities Act prohibits discrimination against a qualified person with a disability, and assures that a disabled person who is nevertheless qualified, with or without accommodation, to work, is entitled to do so. Plaintiff Johnson took leave from a position at his own request, received disability benefits, and now has been classified as entitled to workers' compensation. Nothing about these circumstances implicates the Americans with Disabilities Act.

### **CONCLUSION**

Defendant has established that there no disputes of fact on Plaintiff's claim of employment discrimination. JBI's motion for summary judgment [20] is granted.

ENTER:

Dated: September 17, 2014

REBECCA R. PALLMEYER
United States District Judge